**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                            No. CR 08-0994 JB

LUIS CEBALLOS,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress Evidence, filed August 19, 2008 (Doc. 18)("Motion").  The Court held an evidentiary hearing on November 21, 2008.  The primary issues are: (i) whether the activation of the emergency lights from a marked police car constitutes a seizure which would trigger Fourth Amendment scrutiny; and (ii) whether, if a seizure occurred, the law enforcement officer had a reasonable suspicion justifying the seizure. The Court finds that, under the circumstances of this case, the officer pulling up behind Defendant Luis Ceballos and engaging his emergency lights constituted a display of authority sufficient to support a finding that a seizure occurred.  The Court also finds that the officer did not have reasonable suspicion that criminal activity was occurring.  The seizure was therefore unreasonable under the Fourth Amendment, and the evidence obtained in furtherance of that seizure will be suppressed.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of

rule 12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules

of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of

evidence, including the legality of a search or seizure and the voluntariness of an individual's

confession or consent to search.  See United States v. Merritt, 695 F.2d 1263 (10th Cir. 1982). cert.

denied, 461 U.S. 916 (1983).  In deciding such preliminary questions, the other rules of evidence,

except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 1101(d)(1).  Thus,

the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695

F.2d at 1269.

## FINDINGS OF FACT

1.      On June 11, 2007, at approximately midnight, Taos, New Mexico Police Officer

Valentin Gallegos was patrolling near the Pueblo Allegra Mall in Taos.  See Transcript of Hearing

at 3:17 (taken November 21, 2008)(Gallegos)(Tr.); id. at 4:24 (Gallegos); 11:20-22 (Gallegos).[1]

2.      Gallegos saw an unidentified female walking southbound along the road, Paseo del

Pueblo Sur, when a white Ford pickup approached.  See Tr. at 8:14-9:17 (Gallegos, Valencia).

3.      Gallegos saw the pickup following the female as she turned onto Los Pandos

Road.  See Tr. at 12:25-13:2 (Valencia, Gallegos), 13:14-24 (Gallegos).

4.      Defendant Luis Ceballos was driving the pickup.  See Tr. at 9:8-10 (Valencia,

Gallegos).

5.      Gallegos was suspicious when he observed the pickup making a u-turn and

approaching the unidentified female.  See Tr. at 13:14-24 (Gallegos).

6.      Thinking this activity was suspicious, the officer followed the female and the pickup

---

[1] The Court's citations to the transcript of the hearing refer to the court reporter's original,
unedited version.  Any final transcript may contain slightly different page and/or line numbers.

onto Los Pandos Road.  See Tr. at 13:14-15 (Gallegos), 14:2-4 (Gallegos).

  7.  Gallegos did not state in his report that Ceballos drew his attention by driving badly. See Tr. at 113:21-25.

  8.  Gallegos observed the pickup pull over and stop by the female.  See Tr. at 14:5-8 (Gallegos).

  9.  Gallegos drove up to the female and asked her what the driver of the pickup was doing.  See Tr. at 15:8-10 (Gallegos).

  10.  The female told Gallegos that the driver of the pickup offered her a ride, and that she declined because she was close to home.  See Tr. at 15:10-12 (Gallegos).

  11.  Gallegos asked her if she was alright and if she needed a ride to her home.  See Plaintiff's Exhibit C, Statement of Probable Cause at 1 (sworn June 11, 2007); Tr. at 72:16-17 (Gallegos).[2]

  12.  The female replied that she was alright and that she lived nearby down the road at the end of the condominiums, and declined the ride.  See Statement of Probable Cause at 1; Tr. at 72:18-20 (Gallegos).

  13.  Gallegos asked the female if she knew the person driving the white truck.  See Tr. at 15:16-18 (Gallegos).

  14.  The female told Gallegos that she did not know the driver of the pickup.  See Tr. at See Tr. at 15:16-18 (Gallegos).

---

  [2] At the evidentiary hearing, Gallegos at first denied that he had offered the female a ride. See Tr. at 58:1-5 (Finzel, Gallegos).  When he was shown his Statement of Probable Cause, however, Gallegos indicated that he "must have" offered her a ride, as reflected in the Statement of Probable Cause.  Tr. at 72:16-17 (Gallegos).  The Court accordingly credits the statement in the Statement of Probable Cause.

15.     There was no other discussion between the officer and the female.  See Tr. at 15:13-17 (Gallegos).

16.     Gallegos testified that he was not investigating a crime after he spoke to the girl and that no crime had occurred when Ceballos spoke to the girl and then drove off.  See Tr. at 66:11 (Gallegos).

17.     Gallegos next noticed that the white Ford pickup had driven down the road and pulled into a driveway.  See Tr. at 15:24-16:1 (Gallegos).

18.     After Gallegos left the area where the female pedestrian was located, he saw the pickup truck pull out of the driveway and park just east of the driveway, partly on and partly off the roadway.  See Tr. at 16:10-12 (Gallegos); Government Exhibit 1, DVD Recording at 23:59:40 (showing a recording of the stop and the position of the pickup on the road).

19.     Given that Gallegos was able to observe Ceballos pull out of the driveway and park, and that Gallegos immediately approached Ceballos, it is apparent that very little time elapsed between Ceballos stopping and Gallegos initiating contact with him.  See Tr. at 16:8-12 (Valencia, Gallegos); id. at 16:13-14.

20.     The roadway where the encounter occurred is a very narrow two-lane road, and the area is not well-lit.  See DVD Recording at 23:59:40 (depicting the roadway at night); Government Exhibits 2F, 2G, and 2H (photographs of the roadway taken during the day).

21.     The photographs that the United States has submitted indicate that the street where the encounter between Ceballos and Gallegos occurred was lined with residences, and that the driving lanes end at the curb, i.e., there is no emergency lane or room to pull completely off the road.  See Government Exhibits 2E-2K.

22.     It is a violation of New Mexico law, "upon any highway outside of a business or

-4-

residence district . . . to stop, park or leave standing a vehicle, whether attended or unattended, upon the paved or main-traveled part of the highway when it is practicable to stop, park or leave the vehicle off such part of the highway . . . ."  NMSA 1976 § 66-7-349A.

23.     Ceballos had turned off his headlights.  See Tr. at 16:11-12 (Gallegos).

24.     None of the reports Gallegos prepared contemporaneous to Ceballo's arrest indicate that Gallegos observed Ceballos driving improperly or committing any traffic infractions.  See Tr. at 113:21-25 (Finzel, Gallegos); Notice of Revocation at 1 (listing reason for stop as "suspicious vehicle"); Plaintiff's Exhibit D, Citation for Violating NMSA 1978 § 66-8-102 at 1 (stating that "[i]ndividual was observed driving . . . .")("Citation"); Statement of Probable Cause at 1-2 (describing the encounter between the pickup and the unidentified girl as the suspicious activity that caught Gallegos' attention, and not mentioning any  concern that a traffic violation occurred) .

25.     Gallegos agrees that it was not illegal for Ceballos to offer the unidentified female a ride.  See Tr. at 66:11 (Gallegos).

26.     Gallegos testified that he could not articulate any specific facts for why he initiated contact with Ceballos and that he was operating on a hunch.  See Tr. at 116:22-117:3 (Finzel, Gallegos).

27.     The basis of Gallegos' suspicion was that Ceballos went through the stop light, turned around, approached the girl, spoke to her, and then pulled into a driveway, pulled back out, and parked on the side of the road in a dark area.  See Tr. at 56:24-57:5, 58:11-12 (Gallegos).

28.     Gallegos testified that he feared something might happen to the girl and that she might be abducted, hurt, or killed.  See Tr. at 105:9-10, 107:1-3 (Gallegos).

29.     Gallegos' basis for his fear for the girl's safety was his experience.  See Tr. at 105:13-14 (Gallegos).

30.     Gallegos initiated his emergency lights, pulled up on the pickup, and trained his spotlight on the pickup.  See Tr. at 16:14-16 (Gallegos), 92:1-3 (Gallegos); DVD Recording at 00:00:00 (depicting the encounter, in which it is apparent that the officer has his high beams on and has his flashing emergency lights engaged).

31.     Gallegos' police car is equipped with blue and red flashing emergency lights above the rearview mirror and in the grill, and with yellow warning lights in the back windshield that can be independently engaged to warn traffic to stay away without engaging the emergency lights.  See Tr. at 75:22-76:19 (Finzel, Gallegos).

32.     Gallegos did not employ his siren, but he turned on all of his lights.  See Tr. at 37:13-14 (Gallegos), 76:23-25 (Gallegos).

33.     Gallegos called in the license plate to dispatch and exited his car to make contact with the driver of the pickup.  See Tr. at 17:16-17 (Gallegos).

34.     When the police officer approached the pickup, it was already stopped and parked on the side of the road with the lights off.  See Tr. at 39:19-20 (Gallegos, Valencia).[3]

---

[3] At the hearing, Ceballos testified that he was not stopped when the officer approached him and that he was having difficulties operating the truck because it had a standard transmission, to which he was not accustomed.  See Tr. at 120:16-121:2 (Ceballos).  Ceballos also testified that he did not turn off his lights.  See id. at 121:23-24 (Finzel, Ceballos).  Gallegos testified, however, that the pickup was parked with the lights off.  See Tr. at 39:19-20 (Gallegos, Valencia).  It is not apparent from the DVD Recording whether Ceballos' lights were on.  The Court believes that Gallegos' testimony on this point is more accurate, given the evidence that Ceballos was drinking and that he was impaired on the night of the encounter.  See Statement of Probable Cause (noting that Ceballos told Gallegos that he had been having a few drinks and that he performed poorly on field sobriety tests).  The Court also finds some of Ceballos' testimony about the extent of his drinking to be inconsistent with the Statement of Probable Cause.  At the hearing, Ceballos testified that he had one beer that night.  See Tr. at 135:8 (Ceballos).  Ceballos also testified that he was at Shadows for only fifteen minutes, and that during that time he ate a steak and drank a beer.  See id. at 135:13-17.  The Statement of Probable Cause mentions "a few drinks."  The Statement of Probable Cause also reflects that Gallegos noticed that Ceballos had bloodshot eyes and the smell of alcohol on his breath – both facts suggestive of more than one beer.  See Statement of Probable

35.     Gallegos positioned his spotlight to reflect in the driver's-side rearview mirror to light the area and as a precaution in case the driver posed a danger to the officer.  See Tr. 141:18-21 (Gallegos).

36.     Gallegos testified that, if Ceballos had attempted to drive away when Gallegos engaged his lights and pulled up behind him, Gallegos would have chased him down and arrested him.  See Tr. at 82:25-83:2 (Finzel, Gallegos).

37.     There was little traffic on the road where Ceballos had stopped the pickup.  See  Tr. at 7:4 (Gallegos), 9:6 (Gallegos), 46:18-19 (noting that, by approximately forty-five minutes into the video recording of the encounter, only three cars had passed by).

38.     Gallegos, who was in uniform and who had his firearm with him, approached Ceballos, made contact with him, and asked what was going on.  See Tr. at 18:13 (Gallegos).

39.     Gallegos had his hand on his firearm for the first several minutes of the encounter with Ceballos.  See DVD Recording at 23:59:10.

40.     A second officer was present at the encounter within a few minutes of the initial contact, although it is unclear when Ceballos became aware of the second officer's presence.  See DVD Recording at 00:01:55.

---

Cause at 1.  Ceballos' testimony that he ate steak and drank one beer in fifteen minutes at Shadows is difficult to believe.  The Statement of Probable Cause provides a more coherent and credible narrative, and according to the Statement of Probable Cause, Ceballos had at least a few drinks.  The Court believes the Statement of Probable Cause is accurate and that Ceballos had more than one beer the night of his encounter.  Moreover, there is evidence that Ceballos has been deceptive, both at the initial encounter with Gallegos and during the hearing.  For example, the DVD reveals that, when Gallegos asked Ceballos why he had a shotgun in the truck, Ceballos answered that it was for elk hunting.  See DVD Recording at 00:11:56.  Ceballos' testimony that he spent only fifteen minutes at Shadows eating a steak and drinking one beer is also difficult to believe, and raises concerns about Ceballos' credibility or accuracy that night.  The Court therefore credits Gallegos' testimony that the pickup was stopped with the lights off when he pulled up behind it.

41.    Consistent with what the girl told Gallegos, Ceballos told Gallegos that he offered the girl a ride, but that she did not accept.  See Tr. at 18:13-14.

42.    Ceballos did not have a driver's licence.  See Statement of Probable Cause at 1; Tr. at 53:18-19 (Gallegos).

43.    Ceballos said that he did not have a driver's license and presented Gallegos with an identification card.  See Tr. at 19:25-20:3 (Gallegos); Statement of Probable Cause at 1.

44.    When Gallegos first spoke with Ceballos, he noticed the smell of an alcoholic beverage on Ceballos' breath, and Ceballos' bloodshot and watery eyes.  See Tr. at 83:17-20 (Gallegos); Statement of Probable Cause at 1.

45.    Ceballos admitted that he had been drinking.  See Tr. at 84:14-15 (Gallegos).

46.    Gallegos asked for vehicle insurance documents.  See Statement of Probable Cause at 1.

47.    Gallegos also noticed that, as Ceballos was leaning forward to try to locate and to retrieve vehicle insurance documents in the glove compartment, there was, visible between the car seats, the butt stock of what appeared to be a rifle, which turned out to be a shotgun.  See Tr. at 83:21-25 (Finzel, Gallegos).

48.    Gallegos asked Ceballos if there were any weapons in the vehicle, and Ceballos responded that there were none.  See Tr. at 20:18-19 (Gallegos); Statement of Probable Cause at 1.

49.    Ceballos was unable to produce any insurance documents.  See Statement of Probable Cause at 1.

50.    Gallegos asked Ceballos to step out of the vehicle for a moment, and Ceballos cooperated with his request.  See Tr. at 20:22-24, 21:3-5 (Gallegos).

51.    Gallegos asked Ceballos to turn around and place his hands behind his back.  See Tr.

at 21:7-9 (Gallegos).

52.     Ceballos cooperated, turned around, and placed his hands behind his back.  <u>See</u> Tr. at 21:8-9 (Gallegos).

53.     For police officer safety, Gallegos placed Ceballos in handcuffs and placed him in his police unit. <u>See</u> Tr. at 21:10-14 (Gallegos).

54.     Gallegos told Ceballos that he was not under arrest.  <u>See</u> Tr. at 21:9 (Gallegos).

55.     The police retrieved a loaded Mossberg, Model 300, 12 gauge shotgun from the pickup that Ceballos was driving.  <u>See</u> Tr. at 22:7-8 (Gallegos); Statement of Probable Cause at 1-2.

56.     While removing the shotgun from the vehicle, Gallegos discovered a large amount of cash scattered in the passenger seat and a wallet in the console that was so full of money that it could not close.  <u>See</u> Tr. at 23:4-8 (Gallegos).

57.     Gallegos asked Ceballos if there was anyone who could come for the truck; otherwise, Gallegos was going to have the truck towed.  <u>See</u> Tr. at 21:18-25 (Gallegos).

58.     Ceballos said he did not know of anyone who could come fore the truck.  <u>See</u> Tr. at 21:23-25 (Gallegos).

59.     Gallegos, in preparing to have the pickup towed, inventoried its contents.  <u>See</u> Tr. at 21:23-22:1 (Gallegos).

60.     Pursuant to the inventory search that Gallegos conducted, the officer discovered a white powdery substance, which turned out to be two spindles of cocaine, and a twenty-dollar bill under the driver's side seat.  <u>See</u> Tr. at 23:12-14 (Gallegos).

61.     Upon discovering the cocaine, Gallegos informed Ceballos that he was under arrest. <u>See</u> Tr. at 84:22-23 (Gallegos); Statement of Probable Cause at 2.

62.     While conducting the inventory search of the truck, Gallegos found a .38 caliber

revolver between the driver's and passenger's seats.  See Tr. at 23:16-18; Statement of Probable Cause at 2.

63.     Another officer conducted a pat-down search of Ceballos, and that officer found three .38 caliber bullets and a tin container containing five plastic baggies with a white powdery substance that later tested positive for cocaine.  See Tr. at 24:13-17 (Gallegos).

64.     Ceballos took the field-sobriety test.  See Tr. at 51:9-10 (Gallegos).

65.     Although the Notice of Revocation that Gallegos prepared represents that Ceballos refused to take field sobriety tests, Gallegos testified that the representation in the notice was erroneous and that Ceballos submitted to field-sobriety tests but refused a chemical test.  See Defendant's Exhibit A, Notice of Revocation at 1 (dated June 11, 2007); Tr. at 61:12-15 (Finzel, Gallegos).

66.     Gallegos believed that Ceballos failed the test and offered the implied-consent form. See Statement of Probable Cause at 2.

67.     Ceballos declined to sign the implied-consent form.  See Statement of Probable Cause at 2.

68.     A traffic ticket, ticket number 11429420, was issued to Ceballos on June 11, 2007, at 0023 hours, at Los Pandas Street in Taos.  See Citation at 1.

69.     The ticket was for violating § 66-8-102, NMSA 1978, that is, driving under the influence of intoxicating liquor or drugs.  See Citation at 1.

70.     The essential facts on the ticket are listed as: "individual was observed driving and admitted to drinking an alcoholic beverage." Citation at 1.

71.     Shortly after issuing the ticket, Gallegos filled out a Notice of Revocation regarding the incident.  See Notice of Revocation at 1.

72.     The Notice of Revocation is also dated June 11, 2007, and it gives the reason for the stop as "suspicious vehicle." Notice of Revocation at 1.

## PROCEDURAL BACKGROUND

A grand jury indicted Ceballos on three counts: (i) Felon in Possession of a Firearm and Ammunition in violation of 18 U.S.C. §§ 922(g)(1) & 924(a)(2); (ii) Possession with Intent to Distribute Less than 500 Grams of Cocaine, in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(C); and (iii) Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). See Redacted Indictment at 1, filed May 13, 2008 (Doc. 2)("Indictment").

Ceballos moved the Court for an evidentiary hearing, and for the suppression of all evidence seized and/or statements that he made subsequent to his seizure and arrest. See Motion at 1. In support of his Motion, Ceballos argues that, when a police officer pulls behind a vehicle and engages his emergency equipment, the officer has conducted a seizure "requiring probable cause." Motion at 3. Ceballos argues that he did not engage in any activity that would give rise to an articulable suspicion of criminal activity and that Gallegos conducted "a fishing expedition." Id. at 4- 5. Thus, according to Ceballos, Gallegos stopped him and effected a seizure "wholly without reasonable suspicion," id. at 7, and consequently, all evidence and statements obtained from the stop should be suppressed. See id. at 8.

In its Response, the United States maintains that the initial stop was consensual. See Response to Defendant's Motion to Suppress Evidence (Doc. 18) at 19, filed September 5, 2008 (Doc. 21)("Response"). According to the United States, the seizure did not occur until Gallegos asked Ceballos to exit the truck. See id. By that time, Gallegos had already discovered that Ceballos did not have a driver's license, did not have insurance documentation for the truck, and had demonstrated signs of intoxication. See id. at 20.

-11-

The United States also argues that Gallegos had a reasonable suspicion that criminal activity was afoot when he initiated contact with Ceballos.  See id.  The basis for Gallegos' reasonable suspicion, according to the United States, was that the Gallegos observed Ceballos commit a traffic infraction.  See id.  The United States asserts that Ceballos was parked partially on the roadway in violation of NMSA 1976 § 66-7-349A,[4] and that Gallegos could have issued a citation for this parking if he had desired to do so.  See Response at 20.  The United States also asserts that Ceballos displayed unusual behavior that raised the suspicion that criminal activity "may be afoot."  Id. (internal quotation marks and citations omitted).

At the suppression hearing, the United States conceded that, if the Court finds that the initial contact between Gallegos and Ceballos was in violation of the Fourth Amendment, all of the evidence obtained as a result of the stop would be suppressed pursuant to the "fruit of the poisonous tree" doctrine.  Tr. at 195:25-196:3 (Valencia).  Nevertheless, the United States argued that, given the totality of the circumstances – considering the lone individual walking along the street at night and the pickup making contact with her, then pulling off onto a dark street, stopping and turning off its lights – Gallegos had reasonable suspicion that criminal activity was afoot.  See id. at 180:12-24 (Valencia).  The United States maintained that, in comparison, Gallegos' testimony is more credible

---

[4] NMSA 1976 § 66-7-349A provides:

Upon any highway outside of a business or residence district, no person shall stop, park or leave standing a vehicle, whether attended or unattended, upon the paved or main-traveled part of the highway when it is practicable to stop, park or leave the vehicle off such part of the highway, but in every event an unobstructed width of the highway opposite a standing vehicle shall be left for the free passage of other vehicles and a clear view of such stopped vehicles shall be available from a distance of two hundred feet in each direction upon the highway.

NMSA 1976 § 66-7-349A.

than Ceballos'.  See id. at 186:2-5 (Valencia).

Ceballos argued that law enforcement officers cannot properly develop reasonable suspicion to detain a person by retrospectively pointing out that, while the officer did not, at the time, note any illegal activity or traffic violation, a careful review of the record shows that some infraction or illegal activity occurred that would have justified the detention.  See id. at 194:1-195:11 (Finzel). Ceballos contended that such a rule would put too much discretion in the hands of law enforcement to seize citizens without developing the reasonable suspicion required under the Fourth Amendment. See id. at 195:5-11 (Finzel).

## RELEVANT FOURTH AMENDMENT LAW

The Fourth Amendment protects a person's right to be secure against unreasonable seizure. The hallmark of the Fourth Amendment is reasonableness.  Accordingly, there are three categories of police/citizen encounters: (i) consensual or voluntary encounters; (ii) Terry stops; and (iii) arrests. See United States v. Griffin, 7 F.3d 1512, 1516 (10th Cir. 1993).  What the police may do turns on the category of encounter.

### 1.    Consensual Encounters.

Consensual encounters are "characterized by the voluntary cooperation of a citizen in response to noncoercive questioning."  United States v. Griffin, 7 F.3d at 1516.  Such encounters do not implicate the Fourth Amendment.  See Florida v. Bostick, 501 U.S. 429, 434 (1991)("The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature.").  A police/citizen encounter remains consensual "[s]o long as a reasonable person would feel free 'to disregard the police and go about his business . . . .'" Florida v. Bostick, 501 U.S. at 434  (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)).  "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of

physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry v. Ohio, 392 U.S. 1, 20 (1968).

The United States Court of Appeals for the Tenth Circuit has held that "the stopping of a vehicle constitutes a 'seizure.'" United States v. Orrego-Fernandez, 78 F.3d 1497, 1503 (10th Cir. 1996)(quoting United States v. Walker, 933 F.2d 812, 815 (10th Cir. 1991), cert. denied, 502 U.S. 1093 . . . (1992)).  Thus, "[a] routine traffic stop is a seizure under the Fourth Amendment." United States v. West, 219 F.3d 1171, 1176 (2000).  Ceballos cites numerous cases from other jurisdictions that stand for this same proposition.  See Barrett v. Commonwealth, 447 S.E.2d 243, 245 (1994)("Clearly, the [defendant] was seized when [the officer] pulled in behind him and activated his flashing lights."); Brooks v. State, 745 So.2d 1113, 1113-14 (Fla. Dist. Ct. App. 1999)(explaining that police officer in uniform using his flashing emergency blue lights, even if as he alleged, it was for emergency precaution, created a situation where a reasonable person would not feel free to leave);  State v. Donahue, 251 Conn. 636, 742 A.2d 775, 780 (1999)(state conceded that no reasonable person would feel free to leave after the officer's arrival with flashing emergency lights); McChesney v. State, 988 P.2d 1071, 1075 (Wyo. 1999)(finding that a motorist was not free to leave after police officer activated red and blue flashing lights on police car); Lawson v. State, 707 A.2d 947, 951 (Md. Ct. Spec. App. 1998)(holding the officer's use of flashing emergency lights "was a show of authority that constituted seizure within the meaning of the Fourth Amendment because it communicated to a reasonable person that there was an intent to intrude upon [defendant's] freedom of movement."); State v. Walp, 672 P.2d 374 (Or. App. 1983)(holding that a reasonable person would not feel free to drive away once officer turned on emergency lights).  The Tenth Circuit has not, however, made such a categorical pronouncement about what it means when an officer pulls up behind a stationary vehicle and engages his emergency equipment.

-14-

The Tenth Circuit has stated that the "proper inquiry necessitates a consideration of all the circumstances surrounding the encounter."  United States v. Esparza-Mendoza, 386 F.3d 953, 959 (10th Cir. 2004)(internal quotation marks and citations omitted).  Those circumstances include:

> (1) whether the encounter occurred in a confined or nonpublic space, (2) if the officers confronting the subject were armed or uniformed, (3) the number of officers confronting the subject, (4) whether the officers exhibited an intimidating or coercive demeanor, and (5) if the questions asked by the officer called for potentially incriminating answers.

Id. (internal quotation marks and citations omitted).  Generally, "[p]olice officers may approach citizens, ask them questions and ask to see identification without implicating the Fourth Amendment's prohibition against unreasonable searches and seizures."  United States v. Esparza-Mendoza, 386 F.3d at 959 (quoting United States v. Johnson, 364 F.3d 1185, 1188-89 (10th Cir. 2004)).

The United States Court of Appeals for the Ninth Circuit considered whether a Fourth Amendment-relevant seizure occurred when an officer activated his emergency lights and pulled up behind an individual who was stopped at the edge of a desert highway, and was standing in front of his truck with the hood up and the engine running.  See United States v. Chan-Jimenez, 125 F.3d 1324, 1326 (9th Cir. 1997).  The Ninth Circuit found that a seizure occurred, not necessarily because of the emergency lights, but because "all of the circumstances surrounding the encounter" indicated that a seizure had occurred.  Id.  In United States v. Chan-Jimenez, "[the defendant] walked toward [the officer], who had his hand on his revolver, where he kept it throughout the entire encounter."  Id.  "The [officer] never inquired whether [the defendant] was having trouble with his vehicle; instead he asked to see [his] papers and, after determining that they were in order, held on to them and asked for permission to search the truck."  Id.  Given those facts, the Ninth Circuit found that the officer's "actions made it clear that he had not simply stopped out of concern over the plight of

a stranded motorist."  Id.

In Miller v. Hargett, 458 F.3d 1251 (11th Cir. 2006), the United States Court of Appeals for the Eleventh Circuit considered a police officer's activation of his emergency lights as a factor in whether the officer's approach of an already parked vehicle constituted an unconstitutional stop and seizure.  See 458 F.3d at 1258.  In Miller v. Hargett, the officer first observed the suspect driving around the parking lot in a manner that he considered to given him probable cause to stop and arrest Miller.  See id. at 1253.  The officer alleged that Miller was weaving between lanes and that he made an improper turn into the parking lot.  See id. at 1253-54.  The Eleventh Circuit noted that the officer initiated his "window lights," and not his overhead lights, and that the officer beeped his siren to let the occupants of the car know that he was there.  Id. at 1253.

The Eleventh Circuit Miller v. Hargett emphasized that an officer pulling up behind a parked vehicle and initiating window lights does not, per se, constitute a seizure, and that a court must consider the totality of the circumstances.  See id. at 1258.  In light of the circumstances, the Eleventh Circuit in Miller v. Hargett found that the initial encounter was consensual, because, while the officer had sounded his siren and turned on his window lights, the officer did not draw his gun, give any directions to Miller, or activate his roof lights.  The Eleventh Circuit stated: "[T]he ultimate inquiry is whether Officer Hargett's initiation of his lights and placement of his vehicle exhibited coercion that would make Mr. Miller feel he was not free to leave.  Neither of these facts by itself is dispositive: rather, we consider them in light of the totality of the circumstances."  Miller v. Hargett, 458 F.3d at 1258.

### 2.    Terry Stops.

In Terry v. Ohio, the Supreme Court of the United States held that a police officer can temporarily detain an individual suspected of criminal activity if the officer can point to specific,

articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the intrusion.  See 392 U.S. at 21.  The officer's stop or seizure of a person must be based on reasonable suspicion, which can be supported by specific articulable facts, that the person was involved in wrongdoing.  See id.

Officers may ask the person questions during the Terry stop to dispel or confirm the officers' suspicions that a law is being violated.  See Florida v. Royer, 460 U.S. 491, 498 (1983); United States v. Brignoni-Ponce, 422 U.S. 873, 881-82 (1975).  The detainee, however, is not obliged to respond.  See Berkemer v. McCarty, 468 U.S. 420, 439 (1984)(stating that "the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released.").  A police/citizen encounter that goes beyond the limits of a Terry stop is an arrest which must be supported by probable cause or consent to be valid.  See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").

An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger."  Terry v. Ohio, 392 U.S. at 27.  "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  Id.  A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer."  Id. at 29.  In evaluating the validity of the stop-and-frisk, the totality of the circumstances must be considered.  See Florida v. Bostick, 501 U.S. 429, 436 (1991).

These stop-and-frisk principles apply with equal weight to motorists and to pedestrians. Michigan v. Long, 463 U.S. 1032, 1050-51 (1983). The Tenth Circuit has adopted the Terry doctrine for an investigative detention – "stop" – and for a protective search – "frisk." United States v. King, 990 F.2d 1552, 1557 (10th Cir. 1997)("Terry has come to stand for two distinct propositions – an investigative detention ('stop') in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, . . . and a protective search ('frisk') which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection.")(internal citations omitted). The legal standard is whether a "stop and frisk" is reasonable under the Fourth Amendment. United States v. King, 990 F.2d at 1557.

The court must conduct a two-part inquiry to determine whether an investigative detention is reasonable under the Fourth Amendment. See United States v. King, 990 F.2d at 1557.

> To determine whether an investigative detention or a protective search is reasonable under the Fourth Amendment, the inquiry is twofold. First, the officer's action must be justified at its inception. . . . For an investigative detention, the officer must have an articulable and reasonable suspicion that the person detained is engaged in criminal activity. . . . For a protective search to be "justified at its inception," the officer must not only harbor an articulable and reasonable suspicion that the person is armed and dangerous, the officer must also be entitled to make a forcible stop.
>
> The second prong of the reasonableness inquiry of either an investigative detention or a protective search is whether the officer's action is reasonably related in scope to the circumstances which justified the interference in the first place.

United States v. King, 990 F.2d at 1557 (internal citations and quotation marks omitted).

Neither "inarticulable hunches," nor "inchoate and unparticularized suspicion," will suffice to justify an investigatory detention. Terry v. Ohio, 392 U.S. at 22, 27. In determining the reasonableness of an investigation detention, however, "'common sense and ordinary human experience must govern over rigid criteria.'" United States v. Walraven, 892 F.2d 972, 975 (10th

-18-

Cir. 1989)(quoting United States v. Sharpe, 470 U.S. 675, 685 (1985)).   An investigative detention may be unreasonable when it is a more serious intrusion on one's liberty than is allowable on the mere suspicion of criminal activity.  See United States v. King, 990 F.2d at 1557.

In United States v. Johnson, 364 F.3d 1185 (2004), the Tenth Circuit held that an officer had reasonable suspicion to continue questioning and to frisk a suspect after: (i) the officer had responded  to a call from a citizen who gave his phone number and gave a detailed and accurate description of possible criminal activity and of the suspect; (ii) the contact occurred in Albuquerque's highest-crime area; (iii) and the suspect displayed nervous behavior.  See id. at 1194. The Tenth Circuit noted that the officer's experience and training allowed him to make inferences, based on a combination of the surrounding circumstances, that criminal activity was afoot.  See id. ("His suspicions were particularized to [the suspect], and were based on how his training and experience taught him to interpret a number of objectively reasonable details.").  While many of the factors that the Tenth Circuit considered did not, without more, give rise to reasonable suspicion, the combination of circumstances was sufficient.  See id. at 1193 (noting that the district court had erred because it did not consider that "[a]ll of these factors, mitigating and aggravating, should have been analyzed as part of the totality of the circumstances faced by [the officer] at the inception of the detention").

    3.    **Warrantless Arrests.**

Under certain circumstances, a police officer may lawfully arrest an individual without an arrest warrant, including when the officer witnesses an individual commit an offense in  the officer's presence.  See United States v. Watson, 423 U.S. 411, 418 (1976)("The cases construing the Fourth Amendment thus reflect the ancient common-law rule that a peace officer was permitted to arrest without a warrant for a misdemeanor or felony committed in his presence as well as for a felony not

-19-

committed in his presence if there was reasonable ground for making the arrest."); Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)("A police officer may arrest a person without a warrant if he has probable cause to believe that person committed a crime.").   Thus, to protect the Fourth Amendment's right to be free from unreasonable seizure, probable cause must support formal arrests or seizures that resemble formal arrests.   See Michigan v. Summers, 452 U.S. 692, 700 (1981)(stating that "every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause.").

Probable cause to arrest means a police officer has a reasonable belief that the person arrested has committed or is committing a crime.  As the Supreme Court explained in Wong Sun v. United States, 371 U.S. 471(1963):

> It is basic that an arrest with or without a warrant must stand upon firmer ground than mere suspicion . . .  though the arresting officer need not have in hand evidence which would suffice to convict. The quantum of information which constitutes probable cause -- evidence which would warrant a man of reasonable caution in the belief that a felony has been committed [ -- ] . . . must be measured by the facts of the particular case.

Id. at 479 (internal citations omitted).

> The crucial question for us then is whether knowledge of the related facts and circumstances gave the officer "probable cause" within the meaning of the Fourth Amendment, and "reasonable grounds" . . . to believe that petitioner had committed or was committing a violation of the narcotic laws. If it did, the arrest, though without a warrant was lawful and the subsequent search of petitioner's person and the seizure of the found heroin were validly made incident to a lawful arrest, and therefore the motion to suppress was properly overruled and the heroin was competently received in evidence at the trial.

Draper v. United States, 358 U.S. 307, 310-11 (1959).  See United States v. Valenzuela, 365 F.3d 892, 896 (10th Cir. 2004)(stating that probable cause to arrest exists when facts and circumstances within an officer's knowledge are sufficient to warrant a man of reasonable caution to believe that an offense has been or is being committed).  "Probable cause to arrest exists only when the facts and

circumstances within the officer's knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."  United States v. Valenzuela, 365 F.3d at 896 (10th Cir. 2004)(internal quotation marks omitted).

### 4.    The Exclusionary Rule.

When law enforcement officers obtain evidence in violation of the Constitution, the exclusionary rule generally precludes its use in a criminal prosecution against the victim of the illegal seizure.  See Illinois v. Krull, 480 U.S. 340,  347 (1987)(citing Weeks v. United States, 232 U.S. 383 (1914)).  The exclusionary remedy extends not only to the primary evidence obtained from the illegal seizure, but also to the indirect product of the seizure, the secondary evidence, or the "fruit of the poisonous tree."  Nardone v. United States, 308 U.S. 338, 341(1913).

Evidence is not considered "fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  Wong Sun v. United States, 371 U.S. at 487-88. "To suppress evidence as the fruit of [an] unlawful detention, [the defendant] must make two showings: [i] that the detention did violate his Fourth Amendment rights; and [ii] that there is a factual nexus between the illegality and the challenged evidence."  United States v. DeLuca, 269 F.3d 1128, 1132 (10th Cir. 2001)(internal quotations omitted).  Once the defendant has made those showings, then the government must prove that the evidence the defendant seeks to suppress "is not fruit of the poisonous tree, either by demonstrating that the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as

to dissipate the taint of the unlawful conduct." Id. (internal quotations omitted).  A defendant must at least show that "the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct."  Id. (internal quotations omitted).

Once the defendant has shown a causal connection between the illegal seizure and the specific evidence alleged to be the fruit of the seizure, the government has the burden of persuasion of showing that the evidence is admissible because it was obtained by means sufficiently distinguishable to be purged of the primary taint.  See Brown v. Illinois, 422 U.S. 590, 602-604 (1975); Wong Sun v. United States, 371 U.S. at 488.  Even "the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality."  New York v. Harris, 495 U.S. 14, 19 (1990).

## ANALYSIS

Under the Fourth Amendment, Gallegos' manner of initiating contact with Ceballos, in light of all of the surrounding circumstances, constituted a seizure that triggered Fourth Amendment scrutiny.  While the Court does not believe it is necessary to establish a per se rule that a seizure takes place whenever an officer pulls up behind a parked car and engages his lights, the facts and circumstances attendant to the encounter between Gallegos and Ceballos suggest that a reasonable person would not have felt free to leave.  Because a seizure occurred, Gallegos was required to have at least a reasonable suspicion based on particular facts to justify the initial contact with Ceballos. Because Gallegos did not articulate specific facts in his reports or in his testimony to sufficiently support reasonable suspicion of criminal activity, the subsequent questioning and search were conducted in violation of Ceballos' Fourth Amendment right to be free of unreasonable search and seizure. As a result of Gallegos' violation of Ceballos' right to be free from and unreasonable search and seizure, the Court will suppress all evidence obtained following the initial illegal seizure as fruit

of the poisonous tree, even though Gallegos may have developed probable cause after the initial

contact.

I.   **GALLEGOS CONDUCED A SEIZURE WHEN HE PULLED UP BEHIND CEBALLOS, ENGAGED ALL OF HIS LIGHTS, ASKED CEBALLOS FOR IDENTIFICATION, AND BEGAN QUESTIONING HIM.**

The Court disagrees with the United States' contention that the initial encounter between

Gallegos and Ceballos was consensual, and that therefore no seizure resulted that would trigger a

Fourth Amendment inquiry.  An encounter between a police officer and a citizen remains consensual

"[s]o long as a reasonable person would feel free 'to disregard the police and go about his business

. . . .'"  Florida v. Bostick, 501 U.S. at 434 (quoting California v. Hodari D., 499 U.S. at 628).  An

encounter becomes a seizure when an "officer, by means of physical force or show of authority, has

in some way restrained the liberty of a citizen . . . ."  Terry v. Ohio, 392 U.S. at 20.  To evaluate

whether an officer manifested such a use of force or show of authority to constitute a seizure, a court

must "consider [all] of all the circumstances surrounding the encounter."  United States v. Esparza-

Mendoza, 386 F.3d 953, 959 (10th Cir. 2004)(internal quotation marks and citations omitted).

Those circumstances include:

> (1) whether the encounter occurred in a confined or nonpublic space, (2) if the officers confronting the subject were armed or uniformed, (3) the number of officers confronting the subject, (4) whether the officers exhibited an intimidating or coercive demeanor, and (5) if the questions asked by the officer called for potentially incriminating answers.

Id. (internal quotation marks and citations omitted).

In this case, Gallegos pulled up behind Ceballos and engaged all of his lights, including his

flashing emergency lights and his spotlight.  See Tr. at 16:14-16 (Gallegos), 92:1-3 (Gallegos). The

Court views Gallegos' action of engaging his emergency lights to be a show of authority.  By

engaging his emergency equipment, Gallegos used a recognizable badge of authority, that is, his

emergency flashing lights.

Engaging the emergency lights may not, however, be sufficient, without more, to establish that Ceballos was seized for Fourth Amendment purposes. The driver of a broken down car on the interstate may feel free to leave as soon as the car is fixed, even if a police car is parked behind the individual's car with the emergency lights flashing. Thus, the activation of a police officer's emergency lights must be viewed in light of all the circumstances.

In addition to engaging all of his lights, Gallegos approached the driver's side with his hand on his firearm. See DVD Recording at 23:59:10. He had positioned the spotlight in such a way that it would reflect brightly in Ceballos' mirror – a measure designed to protect the officer's safety by obscuring the suspect's view. See Tr. 141:18-21 (Gallegos). Rather than asking if Ceballos needed assistance, Gallegos asked Ceballos about what was going on with the girl and for identification. The combination of Gallegos' actions constituted what a reasonable person would understand to be a show of authority consistent with a routine traffic stop. It had the appearance of being investigatory in nature, and, given the full light display and the manner of questioning, a reasonable person would not have felt free to leave.

It is instructive that Gallegos candidly testified that, if Ceballos had attempted to drive away when Gallegos engaged his lights and pulled up behind him, Gallegos would have chased him down and arrested him. See Tr. at 82:25-83:2 (Finzel, Gallegos). In other words, Gallegos did not believe Ceballos was free to go. While Gallegos' subjective view is not the focus of the inquiry into whether a reasonable person would have felt free to leave, an officer's view that the encounter was a detention lends credence and makes more reasonable a suspect's view that he is not free to leave. The Court believes that a citizen in Ceballos' position, who had only recently come to a stop, and who faced an officer who had engaged in the full array of procedures for a traffic stop, would

reasonably believe that he was being compelled to remain and be subject to at least brief investigation.

The Court believes this case is analogous to United States v. Chan-Jimenez, in which the Ninth Circuit found that the officer's "actions made it clear that he had not simply stopped out of concern over the plight of a stranded motorist." 125 F.3d at 1326. Like the officer in United States v. Chan-Jimenez, Gallegos kept his hand on his firearm, asked for Ceballos' documentation, and made no inquiry regarding whether Ceballos needed assistance. See id. Gallegos could have engaged warning lights to keep other traffic away, but he instead chose turn on all of his lights, including the red and blue flashing emergency lights. See Tr. at 75:22-76:19 (Finzel, Gallegos). The Court believes that Gallegos turned on the emergency lights as a show of authority to Ceballos, and not merely to warn on-coming traffic to stay away. Thus, the nature of the encounter and Gallegos' behavior would have lead Ceballos to reasonably understand that he was being detained and that he would have to remain until Gallegos advised him that he was free to go.

The Tenth Circuit has expressly held that routine traffic stops are seizures under the Fourth Amendment. See United States v. West, 219 F.3d at 1176. The Court believes that the encounter between Officer Gallegos and Ceballos closely resembled a routine traffic stop to a sufficient degree that Fourth Amendment scrutiny is appropriate. While Ceballos was not moving at the time Gallegos approached him, in the preceding minutes he had been driving, and had recently come to a stop when Gallegos pulled up behind him and engaged the spot light and emergency equipment. In other words, Ceballos was not in the situation where he had been stationary for a long period of time, and would have the expectation that an officer would pull up to offer assistance or inquire why he was stopped. Rather, the Court believes that, from the perspective of someone in Ceballos' position, the encounter would have felt like a traffic stop.

Ceballos would not have reasonably felt free to leave under the circumstances of the police officer activating his emergency lights and pulling in behind Ceballos' parked vehicle.  The police officer engaged in a stop and seizure from the moment that he activated his emergency lights and pulled behind Ceballos' vehicle.

Ceballos has cited numerous cases from federal and state courts discussing the use of emergency lights in traffic stops, and the government has sought to distinguish those cases.  Those state-law cases that the parties have cited are not controlling authority.  The Court examines the cases only for their persuasive value.  After careful consideration of those state-law cases, the Court finds that they are, for the most part, not helpful to the present inquiry.  In as much as many of the cases establish the basic proposition that, when an officer brings a motorist to a stop using his emergency lights, a seizure has occurred, Tenth Circuit law on point exists.  In light of Tenth Circuit law on point, the Court agrees that an officer engages in a search when he stops someone.  See United States v. West, 219 F.3d at 1176; McChesney v. State, 988 P.2d 1071, 1073 (Wyo. 1999)(finding a seizure where officer followed suspect vehicle and initiated his emergency lights to effectuate a stop); Brooks v. State, 745 So.2d 1113, 1113-14 (Fla. App. 1 Dist. 1999)("As [the defendant] was driving the vehicle onto the roadway, she stopped when she saw the flashing lights and uniformed police officer approaching the car."); Clarke v. Commonwealth, 527 S.E.2d 484,489 (Va. App. 2000)(finding a seizure where officer engaged emergency lights and ordered vehicle to stop); Barret v. Commonwealth, 47 S.E.2d 243, 245 (Va. App. 1994)("Clearly, Barrett was seized when Trooper Lyons pulled in behind him and activated his flashing lights."); Lawson v. State, 707 A.2d 947, 949 (Md. App. 1997)(finding a seizure where the officer "noticed that the car began to back up, so he turned on his emergency lights to 'cause the vehicle to stop'").  The Court also agrees with the United States that those cases are distinguishable from this situation, given that Ceballos

had already stopped of his own accord when the officer pulled up to him and engaged the emergency lights.  Nevertheless, the totality of circumstances counsel a finding that there was a sufficient show of authority in this case so that Ceballos would not have reasonably felt that he was free to leave.

Admittedly, not all of the cases that Ceballos cites involved stops.  Even so, the Court finds difficulty following those cases, because some are factually distinguishable, while others are either based in state statutory law, or are unpersuasive.  For example, State v. Donahue, 742 A.2d 775 (Conn. 1999), involved an officer pulling up behind a vehicle that was parked and had its motor running.  See id. at 778.  Nevertheless, the Supreme Court of Connecticut did not hold that such a scenario gives rise to a seizure.  Rather, the Supreme Court of Connecticut noted that the prosecution had conceded that a reasonable person would not have felt free to leave and upheld the trial court's finding on that issue.  See id. at 779 (noting the prosecution's concession that a reasonable person would not have been free to leave under the circumstances and fact that lower appellate court did not disturb the trial court's finding of a seizure).  In State v. Walp, 672 P.2d 374 (Or. App. 1983), the Oregon Court of Appeals found that a reasonable person was not free to leave when the officer followed for some distance, and, after the defendant voluntarily pulled over, the officer engaged his emergency lights.  See id. at 375.  In that case, however, the Oregon Court of Appeals was interpreting an Oregon statute and did not reach constitutional issues.  State v. Walp, 672 P.2d at 375.  It is unclear, therefore, what impact, if any, State v. Walp should have on this case.

Ceballos cites one state-law case that is both analogous to this case and somewhat persuasive.  In State v. Stroud, 634 P.2d 316 (Wash. App. 1981), the Washington Court of Appeals found that a seizure occurred "at the moment the officers pulled up behind the parked vehicle and switched on the flashing light." Id. at 396.  "Under the totality of the circumstances, the officer' attempt to summon the occupants of the parked car with both their emergency lights and high beam

headlights constituted a show of authority sufficient to convey to any reasonable person that voluntary departure from the scene was not a realistic alternative." Id. The Court believes that the Washington Court of Appeals employed the "totality of circumstances" analysis applicable here, and was interpreting the Fourth Amendment to the United States Constitution rather than state law. See id. (citing federal constitutional case law). The Court tends to agree that, under the totality of the circumstances, two officers who engage the emergency and high beam headlights, attempt to summon the occupants of a vehicle, and alight from their car and begin approaching the stopped car have demonstrated authority sufficient to constitute a seizure. This case involved a similar show of authority. Gallegos placed his spot light directly in Ceballos' mirror to hinder Ceballos' vision and to protect the officer, engaged the emergency lights, approached Ceballos with his hand on his gun, and began questioning and asking for identification.

The Court need not establish a per se rule that a search occurs whenever an officer pulls behind a parked car and engages his or her emergency equipment. The Court can imagine scenarios in which an officer pulls up behind a parked or stranded vehicle, and engages any combination of emergency lights in a manner suggestive of an attempt to offer aid and protect the stranded vehicle, or in which the officer is alerting an individual to his presence without initiating a detention. See Miller v. Hargett, 458 F.3d at 1258. If an officer came upon an individual changing a flat tire and engaged the lights, for example, the individual might be unreasonable in believing that he is being detained. The Court believes that the Supreme Court's command to evaluate the totality of circumstances counsels against a bright-line rule in this instance.

The Court therefore finds that a seizure occurred, and that the Fourth Amendment came into play. Because the circumstances counsel a finding that the encounter was not consensual, and that a seizure occurred, Gallegos was authorized to initiate his investigation of Ceballos only if he had

at least a reasonable suspicion based on specific facts.

## II.    THE STOP AND SEIZURE WAS WITHOUT REASONABLE SUSPICION.

To make an investigative detention, an "officer's action must be justified at its inception. .

. . For an investigative detention, the officer must have an articulable and reasonable suspicion that

the person detained is engaged in criminal activity." United States v. King, 990 F.2d at 1557. "For

a protective search to be 'justified at its inception,' the officer must not only harbor an articulable

and reasonable suspicion that the person is armed and dangerous, the officer must also be entitled

to make a forcible stop." Id. (citations omitted). In this case, the United States has conceded that,

if a seizure occurred, and if Gallegos did not have reasonable suspicion to initiate the encounter with

Ceballos, all of the fruits of the stop will be suppressed. See Tr. at 195:25-196:3 (Valencia). The

Court therefore focuses its inquiry on the justification, or the lack thereof, that Gallegos had for

initiating contact with Ceballos.

The documents prepared in conjunction with Ceballos' arrest do not, on their face, offer

particular facts sufficient to demonstrate that Gallegos had a reasonable suspicion to justify

detaining Ceballos. The Statement of Probable Cause, which contains a narrative of the encounter,

states:

> On June 11, 2007, at approximately 0003 hours I was patrolling the area of Paseo
> Del Pueblo Sur near the Pueblo Allegre Mall and saw a female walking along the
> road southbound while a white in color Ford pickup followed her onto Los Pandos
> Road. This appeared to be suspicious activity and I decided to follow them onto Los
> Pandos Road. I saw the pickup stop with the female which was on Los Pandos Road
> at this time and then drive on east on Los Pandos. I stopped with the female and
> asked if she was alright and if she needed a ride to her home. She replied that she
> was alright and she lived down the road in the Condos. I asked her if she knew the
> person driving the white truck and she said that she did not. I asked her what he had
> stopped with her for and she said he offered to give her a ride. By this time, the
> white Ford pickup had drove ointo [sic] a driveway and stopped. As I drove on the
> white pickup backed out of the driveway and parked just east of the driveway
> partially on the roadway. I contacted Taos Central Dispatch and advised that I was

going to see what was going on with the Pickup, read the license plate and turned on
my emergency equipment.  I approached the driver and asked him what he was
doing.  The driver replied that he had offered to give the female a ride but she
refused.

Statement of Probable Cause at 1.  Thus, under a fair reading of the statement of probable cause, the

officer became suspicious because Ceballos approached the female and spoke to her, then pulled off

on to another street, pulled into a driveway, backed out, and parked on the side of the road, partially

in the roadway.  The Statement of Probable Cause does not contain any particularized facts about

why any of the activity that Gallegos observed was suspicious, whether he observed any traffic or

other infractions, or what criminal activity he thought might be taking place.

The Notice of Revocation and the Citation that Gallegos issued are similarly bereft of facts

that would give rise to a reasonable suspicion.  The Notice of Revocation gives the reason for the

stop as "suspicious vehicle."  Notice of Revocation at 1.  The Citation lists the "essential facts" as:

"Individual was observed driving and admitted to drinking an alcoholic beverage."  Citation at 1.

Neither document can be read to provide a basis for reasonable suspicion before Gallegos activated

his emergency lights and pulled up behind Ceballos.

The basis in the Citation for the conclusion that Ceballos was driving is apparently that

Gallegos saw Ceballos driving and that Ceballos admitted driving.  The term "Suspicious vehicle,"

to which the Notice of Revocation makes reference, is an inadequate explanation under the facts of

this case as a justifiable reason to stop Ceballos.  The suspicious-vehicle language apparently refers

to the fact that Ceballos stopped to offer a woman walking down the street a ride and, when she

refused, Ceballos drove on.  Ceballos' conduct was the same conduct in which Gallegos engaged;

the woman also rejected Gallegos' offer of a ride home.  While Ceballos may have engaged in

suspicious activity and therefore made his pickup into a suspicious vehicle, a young man in a pickup

talking to a woman walking down the street is not, without more, a crime or evidence of a crime. In the end, Gallegos engaged in a fishing expedition.

Gallegos' testimony at the suppression hearing did not remedy the lack of particular facts necessary to establish reasonable suspicion. Gallegos' testimony at the suppression hearing was largely consistent with what he put down in the contemporaneous reports. He re-described the scene that raised his initial suspicions in the same terms as in his report. See Tr. at 13:14-24 (Gallegos), 56:24-57:5, 58:11-12 (Gallegos). More important, Gallegos admitted at the hearing that he could not articulate any specific facts for why he initiated contact with Ceballos and that he was operating on a hunch. See Tr. at 116:22-117:3 (Finzel, Gallegos). While it is true that Gallegos was relying on his experience, which suggested to him that something might be amiss, and an officer's experience should not be discounted in the determination of reasonable suspicion, see United States v. Johnson, See 364 F.3d at 1194, an experienced officer's hunches do not vitiate the requirement that he be able to articulate particularized facts that give rise to his reasonable suspicions that criminal activity is afoot. "[I]narticulable hunches," and "inchoate and unparticularized suspicion," will not suffice to justify an investigatory detention. Terry v. Ohio, 392 U.S. at 22, 27. Thus, Gallegos' testimony that he was operating on a hunch and that he could not articulate particular facts is fatal to a contention that there was reasonable suspicion to make the detention.

The United States argued in briefing and at the hearing that Gallegos could have issued a citation if he had wanted to, and that Gallegos feared that, based on Ceballos' behavior, the late hour, and the lack of traffic and light, that Ceballos might have been positioning himself to abduct the girl. First, the Court does not believe that law enforcement officers can retrospectively scour the record to discover possible violations, and then use the violations to show that reasonable suspicion existed. Gallegos did not mention any potential traffic violations in his contemporaneous

reports, nor did he articulate any facts in those reports to suggest that he feared that any specific

crime was being, or was about to be committed.  The object of the Fourth Amendment and the

exclusionary rule is "to protect all citizens, particularly the innocent, by deterring overzealous police

behavior."  United States v. Johnson, 364 F.3d at 1190 (citing Mapp v. Ohio, 367 U.S. 643, 656

(1961)).  It would undermine the exclusionary rule's function as a deterrent to permit officers the

luxury of making detentions, and then later studying the record and cherry-picking justifications for

making the detentions.  The Court finds no case law that permits law enforcement to establish

reasonable suspicion in retrospect.

Second, the Court does not believe that there was reasonable suspicion or probable cause that

Gallegos witnessed any crimes or violations.  Ceballos did not violate NMSA 1976 § 66-7-349A,

which states:

> Upon any highway outside of a business or residence district, no person shall stop,
> park or leave standing a vehicle, whether attended or unattended, upon the paved or
> main-traveled part of the highway when it is practicable to stop, park or leave the
> vehicle off such part of the highway, but in every event an unobstructed width of the
> highway opposite a standing vehicle shall be left for the free passage of other
> vehicles and a clear view of such stopped vehicles shall be available from a distance
> of two hundred feet in each direction upon the highway.

NMSA 1976 § 66-7-349A.[5]  The Court notes that, as the photographs of the scene reflect, Ceballos

was in an area more properly characterized as residential.  NMSA 1976 § 66-7-349A applies to

highways "outside of a business or residence district."  Id.  Moreover, the photographs also indicate

that it would not have been practicable for Ceballos to pull completely off the road.  The Supreme

---

[5] The United States mentioned a possible violation of NMSA 1976 § 66-7-349A for the first time in its briefing.  See Response at 20.  While there was some testimony at the hearing that was relevant to whether Ceballos violated the statute, Gallegos' Statement of Probable Cause contains no reference to the statute, and he consistently testified that he approached Ceballos for suspicious activity, and not for a traffic violation.

Court of New Mexico has stated:

> [W]here it is impractical for a car to park entirely off the highway, it is not a violation of the provisions of § 64-18-49, N.M.S.A., 1953 Comp., for it to be parked partially or entirely on the highway, regardless of the reason for stopping, so long as the other mandatory provisions of the statute are met; i. e., that an unobstructed width of highway opposite the standing vehicle is left for the free passage of other vehicles and a clear view of such stopped vehicle is available for a distance of 200 feet in each direction.

Horrocks v. Rounds, 70 N.M. 73, 77, 370 P.2d 799, 801 (1962).  Even if the encounter occurred on what could be characterized as a "highway," Ceballos was parked as far to the side as possible without driving up onto the curb or stopping in someone's driveway, and he left ample room for other cars to pass by.  The Court therefore believes that Ceballos' activity did not give rise to a reasonable suspicion that he violated NMSA 1976 § 66-7-349A.

Moreover, even if the Court credits Gallegos' testimony that the scene reflected a possible abduction, the officer did not point to specific facts about the scene that suggested that he would have been reasonable in suspecting that an abduction, or any other crime, was about to occur. Gallegos testified that, when he spoke to the girl, she stated that Ceballos offered her a ride and that she refused because she was close to home.  There is no evidence that she manifested any apprehension or gave Gallegos any reason to suspect that a crime had taken place or was about to take place.  Ceballos' behavior, as Gallegos described it, was not indicative of crime.  As Gallegos testified, Ceballos stopped, spoke briefly with the girl, turned onto another street, pulled into a driveway, backed out, then pulled off to the side of the road and stopped.  While this activity might have been out of the ordinary, especially at night, none of it was illegal, and none of it suggested that Ceballos was taking steps toward abducting the girl.  Indeed, Gallegos testified that he was not investigating any crime and that no crime had occurred.  See Tr. at 66:11 (Gallegos).

The Court credits Gallegos' testimony that he was operating on a hunch and that he had no

-33-

specific facts upon which to base his suspicion.  Given that testimony, and the Court's review of the facts and circumstances surrounding the detention, the Court finds that Officer Gallegos did not have reasonable suspicion and was therefore not justified in detaining Ceballos.

**III.    THE COURT WILL SUPPRESS THE EVIDENCE AND STATEMENTS OBTAINED AS A RESULT OF THE DETENTION AS FRUIT OF THE POISONOUS TREE.**

The Court will suppress, pursuant to <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963), all evidence seized and statements made as the result of this illegal stop and seizure as the fruit of the poisonous tree.  The United States has conceded that the Court must do so in this case if the Court finds that the initial detention was conducted in violation of the Fourth Amendment.  <u>See</u> Tr. at 195:25-196:3 (Valencia).  The Court agrees that suppression of all of the evidence and statements obtained from the search is the correct remedy.  The Supreme Court of the United States in <u>Wong Sun. v. United States</u> explained that, under the doctrine of the fruit of the poisonous tree, the focus of the inquiry is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  371 U.S. at 488 (internal quotation marks and citations omitted).  In this case, the initial detention led to the capture of all of the evidence at issue on this suppression motion.

Gallegos initially detected alcohol and saw what looked like the butt of a rifle protruding from in between the seats.  While Gallegos might have arguably had reasonable suspicion, or even probable cause upon making those observations, he was already conducting the search that facilitated those observation without the requisite justification under the Fourth Amendment.  The Court therefore concludes that the evidence should be suppressed.

**IT IS ORDERED** that the Defendant's Motion to Suppress Evidence is granted.  The

-34-

evidence and statements gathered pursuant to Officer Valentin Gallegos' detention of Defendant

Luis Ceballos will be suppressed.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Gregory J. Fouratt
   United States Attorney
Louis E. Valencia
   Assistant United States Attorney
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Roger A. Finzel
   Assistant Federal Public Defender
Federal Public Defender
Albuquerque, New Mexico

   *Attorney for the Defendant*